UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| LORI RYAN,<br><br>                    Plaintiff,<br><br>v.<br><br>THE INTERNET TRUCKSTOP LLC,<br><br>                    Defendant. | Case No. 1:20-cv-00321-CWD<br><br>**MEMORANDUM DECISION AND ORDER** |

## INTRODUCTION

Plaintiff Lori Ryan's two count complaint alleges a violation of the Family Medical Leave Act ("FMLA") and breach of the covenant of good faith and fair dealing. The Court has before it Defendant's motion for summary judgment. (Dkt. 22.) On September 16, 2021, the Court conducted a hearing on the motion, and heard arguments concerning the evidentiary objections raised in Defendant's reply memorandum. (Dkt. 30.) Plaintiff conceded that Defendant is entitled to judgment as a matter of law on the claim for breach of the covenant of good faith and fair dealing, as it is duplicative of her FMLA claim, and clarified she is asserting only an interference claim under the FMLA.[1] For the reasons that follow, the Court will deny Defendant's motion on Plaintiff's FMLA claim due to the existence of material factual disputes that must be resolved by a jury.

---

[1] The Complaint mentions both interference and retaliation under the FMLA.

**MEMORANDUM DECISION AND ORDER - 1**

## FACTS[2]

The Internet Truckstop, LLC ("Truckstop") is the largest on-line freight matching marketplace in North America, providing software as a service (SaaS) that supports the entire freight-moving lifecycle. Conner Decl., ¶ 2. (Dkt. 22-3.) Truckstop currently has more than 650 employees in 7 locations in the United States (including Boise, Idaho) and Canada. *Id*.

Ryan was hired at Truckstop's Boise office as a sales representative on or around May 1, 2017. Berard Decl., ¶ 4. (Dkt. 22-4.) During her employment with Truckstop, Ryan was an hourly, non-exempt, at-will employee. Grande Decl., Ex. 1, Ryan Depo. at 37. (Dkt. 22-7 at 8.) Ryan also earned commissions based upon a percentage of sales. Ryan Depo. at 110. Ryan was initially assigned to the small business sales team. Ryan Depo. at 29. That team targeted accounts with $5 million or less in revenue. *Id*. at 30-31. Ryan's duties consisted of selling software to logistic companies and individual brokers. *Id*. at 29. While in that position, Ryan's supervisor was Amanda Bartron. *Id.* at 30.

At the end of 2017, Bartron promoted Ryan to the mid-sized market sales team, which handled accounts ranging from $5 - $50 million in revenue. Ryan Depo. at 31 – 36. On the mid-sized market team, Ryan and her fellow sales representatives managed between 1,000 to 1,500 accounts each. *Id*. Ryan was responsible for sales of Truckstop's software, contacting anywhere from 50 to 100 of her assigned accounts every couple of

---

[2] Except where noted, the following facts appear undisputed. The Court relied upon Truckstop's statement of undisputed facts, Ryan's response thereto, and the declarations and exhibits in the record. (Dkt. 22-2, 25-1, and 28.)

**MEMORANDUM DECISION AND ORDER - 2**

days. *Id*. Ryan was one of the top sales producers on the mid-market sales team. Ryan Decl. ¶ 7. (Dkt. 25-2.)

Amanda Bartron was the supervisor of the mid-market sales team until September of 2018, when she was promoted to the position of Corporate Expansion Sales Director. Bartron Decl., ¶ 2. (Dkt. 22-6.) When Bartron moved into the Director role, Morgan Strasser was promoted into Bartron's former position managing the mid-sized market sales team, and Ryan became one of his direct reports. Strasser Decl., ¶ 2. (Dkt. 22-5.) In his new role, Strasser oversaw a team of approximately eight salespeople, and he reported directly to Bartron. Bartron Decl., ¶ 3.

When Ryan moved to the mid-sized market sales team, her regular work hours were scheduled from 9:00 a.m. to 5:30 p.m., Monday through Friday.[3] Ryan Depo. at 33. Bartron Decl., ¶ 4. Ryan understood that, pursuant to Truckstop's "Attendance and Punctuality" policy, she needed to be at work by her scheduled start time. Ryan Depo. at 39 – 40. Ryan also understood that, as a non-exempt employee, she was expected to clock-in at the start of her shift, clock out and back in for any meal breaks, and then clock-out at the end of her shift. Ryan Depo. at 41.

Truckstop's stated policy in its employee handbook required timecards to be completed accurately. Conner Decl., Ex. 2 at 9. (Dkt. 22-3 at 21.)[4] The policy further

---

[3] Although neither Ryan nor Truckstop indicated Ryan's lunch and break times, the Court assumes based upon the work hours that she was allotted a thirty minute lunch break.

[4] Ryan was provided with, and reviewed, Truckstop's Employee Handbook during new hire training in May of 2017. Grande Decl., Ex. 1, Ryan Depo. at 38 - 39. (Dkt. 22-7 at 8.) However, there is no evidence in the record that Ryan signed the Employee Handbook Acknowledgement. Berard Decl. Ex. 1. Conner Decl. Ex. 2.

**MEMORANDUM DECISION AND ORDER - 3**

stated that falsifying a timesheet while employed at Truckstop "can lead to disciplinary action, up to and including termination." *Id.* Ryan contends, however, that throughout her employment with Truckstop, management was

> very lax in enforcing their policies regarding calling in to report absences and clocking in and out. Employees would often show up late or leave early without giving any notice and it was never a problem. Often employees would take long lunches and not be required to notify anyone or even log the time off. Often managers would tell employees they would 'fix' their timecards after the fact.

Ryan Decl. ¶13.

Ryan's co-worker, Daniel LaNoue, submitted a declaration confirming Ryan's observations. Truckstop employed LaNoue between February 2017 and December 2019. LaNoue Decl. ¶ 1. (Dkt. 25-4.) During that period, LaNoue worked with Ryan on both the small business sales team, and later, on the mid-market sales team. *Id.* LaNoue states that, when he began his employment, Truckstop was using a timekeeping system called ADP. *Id.* ¶ 4. LaNoue states that instances of "arriving late or leaving early were rarely reported" to either Amanda Bartron or Morgan Strasser, the managers of the respective sales teams, and that the managers cared more about sales numbers and quotas. *Id.* ¶ 3. According to LaNoue, "[i]f you put up your target number in sales for the day early, you could leave for the rest of [the] day without reporting it to anyone. We did this often. People were rarely disciplined for anything related to attendance. I came in late and left early many times without notifying my supervisor and I was never disciplined." *Id.*

A review of the timecard records Truckstop submitted from its ADP software for the period between January 1, 2018, and December 24, 2018, indicates Ryan did not

**MEMORANDUM DECISION AND ORDER - 4**

always clock in and out between the hours of 9:00 a.m. and 5:30 p.m. Conner Decl. Ex. 3.[5] There are also instances reflecting what appear to be timecard edits made by Ryan's supervisor, Amanda Bartron. *See* n.5.

In the fall of 2018, Truckstop contends Ryan had an increasing number of instances where she was not working her scheduled shift, was arriving late or leaving early, or was not reporting to work in the first place. Strasser Decl., ¶ 4. Ryan states that, in late 2018, she was experiencing significant flare-ups related to her lupus. Ryan Decl. ¶ 9.

On November 5, 2018, Strasser and Bartron met privately with Ryan to discuss her attendance and performance issues. Strasser Decl., ¶ 4. According to Strasser, who had recently assumed managerial responsibilities for the mid-market sales team in September of 2018, Ryan's increasingly frequent absences from work were resulting in unsatisfactory performance. *Id*. Bartron also asserted that Ryan's absenteeism was resulting in several new accounts not being worked properly, and Truckstop sales management was receiving an increasing number of requests directly from customers to reassign their accounts to another manager. Bartron Decl., ¶ 5. Strasser contends he and

---

[5] Truckstop provided Ryan's timekeeping records from its electronic software program, ADP, for the time period January 1, 2018, to December 24, 2018, and an "Edit Audit Report" for the months of November and December 2018. Conner Decl. Ex. 3, 4. There are numerous instances where Ryan did not work between 9:00 a.m. and 5:30 p.m. *See, e.g.*, May 1, 2018, time in 8:48 AM time out 2:34 PM; May 23, 2018, time in 10:52 AM time out 5:09 PM. (Dkt. 22-3 at 40.) Truckstop did not submit any records of Ryan calling in absences for dates prior to December 13, 2018, and there are no corresponding pay records. Finally, there are instances indicating timecard edits. *See, e.g.*, May 29, 2018, time in 10:14 AM time out 12:30 PM time in 12:30 PM time out 5:00 PM "Out Time Reason: EDIT – Timecard Edit – Out Time Note: clock out at 5:00 pm." (Dkt. 22-3 at 40). Other records appear to indicate that Amanda Bartron changed Ryan's time entries. *See, e.g.,* Edit Audit Report Date Range 07/01/2018 – 07/31/2018, for 07/06/2018. (Dkt. 22-3 at 50.) Truckstop did not provide an explanation of these records.

**MEMORANDUM DECISION AND ORDER - 5**

Bartron reiterated to Ryan that any deviation from her scheduled hours needed to be communicated to either him or Bartron prior to the absence or a tardy arrival. Strasser Decl. ¶ 4.

Strasser and Bartron assert that, during the November 5, 2018 meeting, Ryan informed them that her absenteeism "was in part" due to a medical condition. Bartron Decl., ¶ 6; Strasser Decl., ¶ 5. Ryan contends, however, that both Bartron and Strasser already were well aware that her absences were due to flare ups from lupus. Ryan Decl. ¶¶ 9, 10.

Strasser and Bartron claim that, upon hearing that Ryan's absences were due to a medical condition, they encouraged her to speak to Human Resources and expressed that they wanted Ryan to have FMLA protection if she needed it. Bartron Decl., ¶ 6; Strasser Decl., ¶ 5. Ryan recalls Strasser encouraged her to "look at getting on FMLA" to cover herself and Truckstop, so her "position with the company was protected." Ryan Depo. at 43 – 44.[6]

Ryan denies that her absenteeism resulted in unsatisfactory performance, asserting she was one of the top sales producers on the small market and mid-market sales teams, despite having to take time off periodically to accommodate flare-ups of her lupus. Ryan Decl. ¶¶ 3, 4, 6, 7. Ryan states that, during the time Bartron was her supervisor, Bartron was "empathetic, considerate, and accommodating of [her] need to take time off or come

---

[6] Ryan contends also that she informed Strasser in October of 2018, prior to the November 5, 2018 meeting, that she wanted to apply for intermittent FMLA leave. Ryan Decl. ¶ 10.

**MEMORANDUM DECISION AND ORDER  - 6**

in late or leave early" due to her lupus symptoms. *Id.* Ryan contends that Strasser was not as understanding, having stated to her that, "I don't believe you actually have lupus." *Id.* ¶ 9.[7]

Following the November 5 meeting, on November 14, 2018, Ryan sent an email to Michelle Berard, Truckstop's Human Resource lead for its Boise office, asking for FMLA paperwork. Berard Decl., ¶ 5, Exs. 2, 3. Berard advised Ryan to contact Lincoln Financial, Truckstop's third-party administrator for FMLA. *Id.* Ryan initiated her FMLA application with Lincoln Financial that same day, November 14, 2018. Berard Decl., ¶ 6, Ex. 4.

Paperwork Ryan received from Lincoln Financial included a written document entitled, "Important Information from Truckstop.com Relating to Your Absence Request," which stated that, per "company policy, if the leave is intermittent you are (1) required to report any absence related to your leave to Lincoln within two business days and (2) to your supervisor before the start of the shift." Berard Decl., ¶ 6, Ex 4 at 4. Ryan testified during her deposition that she understood she was required to report her absences to her supervisors (Strasser or Bartron) before the start of her shift. Ryan Depo. at 67 – 69.

Ryan met with Berard and Bartron on December 6, 2018, to address deficiencies with Ryan's application to Lincoln Financial, which in turn required Ryan to follow up

---

[7] It is not clear when Strasser allegedly made this statement. Based upon Ryan's declaration, it appears Strasser may have made the statement prior to or around the time of the November 5, 2018 meeting between Strasser, Bartron, and Ryan.

**MEMORANDUM DECISION AND ORDER  - 7**

with her physician on December 17, 2018, to complete additional FMLA paperwork. Berard Decl., ¶¶ 7, 8, 9, 10, and Exs. 5, 6; Conner Decl., ¶ 7. Berard claims she reiterated to Ryan during the meeting on December 6, 2018, that if Ryan was going to be out on FMLA for treatment or incapacity, she needed to communicate the information to her supervisors (Strasser and Bartron), and to clock in and out via Truckstop's timekeeping software. Berard Decl. ¶ 9.

Vicki Conner, who assumed the role of Director of People Operations (Human Resources) for Truckstop in August of 2018, contends Truckstop's timekeeping policy requiring Ryan, as an hourly, non-exempt employee, to clock-in and clock-out from her workstation did not change when Ryan was approved for intermittent FMLA. Conner Decl., ¶ 8. Conner states that Ryan's FMLA leave required Ryan's supervisors (either Strasser or Bartron) to input her FMLA leave on those days when she was out, because she was not physically in the office to clock-in and clock-out. *Id.*

Strasser was aware Ryan was approved for intermittent FMLA leave in late November or early December of 2018. Strasser Decl. ¶ 6. He alleges he became aware that Ryan's absences were exceeding her approved FMLA leave, such that he encouraged her to speak to human resources or the third-party administrator about adjusting her claim "if needed, so again—she would be protected." Strasser Decl., ¶ 7. Ryan denies Strasser encouraged her regarding either her medical condition or her need for FMLA leave, instead contending Strasser "interfered with my application process and told me at least once that my doctor's information was insufficient. He made me go back to my doctor to

get additional evidence of my condition, even though Lincoln Financial had already told me that my application was complete." Ryan Decl. ¶ 10.

Thereafter, a series of meetings and events occurred during the months of December and January, up to the date of Ryan's termination from employment effective January 9, 2019.

### December 13, 2018 – Meeting

There are differing accounts regarding a meeting that occurred on December 13, 2018. Bartron states she met with Ryan on December 13 to discuss reducing her sales quota and adjusting her territory (her number of accounts) to accommodate her FMLA leave. Bartron Decl., ¶ 9. Prior to the meeting, Bartron emailed Berard to understand when Ryan's FMLA was effective, so Ryan's quota goal for November could be calculated, and so Bartron could determine by what percentage to adjust Ryan's assigned accounts. *Id*., Ex. 1. Ryan did not receive a copy of the email correspondence between Bartron and Berard. Ryan Depo. at 109.

Bartron alleges that, as Director of the sales department, it was her responsibility to ensure Ryan's sales territory was properly reduced. Bartron Decl., ¶ 10. Bartron claims she directed Strasser to speak with Ryan concerning the reduction of her territory. *Id.* Bartron asserts that Ryan was tasked with selecting 400 accounts she wanted to continue to service, a 60% reduction based upon information from Human Resources concerning Ryan's attendance and FMLA leave over the past 30 days. *Id.* Bartron expected that 600 of Ryan's accounts were to be partially assigned to other sales representatives. *Id.* Bartron states, however, that she "personally reassigned several of Ms. Ryan's

MEMORANDUM DECISION AND ORDER  - 9

clients…throughout November and December of 2018" when "the customer requested a new representative…" *Id.* [8]

Strasser contends he and Bartron spoke to Ryan on December 13, 2018, "to reiterate and clarify expectations on attendance as she was not following the agreed to procedures stated in the FMLA paperwork from Lincoln, and company procedures." Strasser Decl. ¶ 8. Strasser documented the conversation with Ryan, describing the "coaching we provided to her." Strasser Decl. ¶ 8, Ex. B. Strasser states also that he and Bartron advised Ryan to select the 400 accounts to keep, so that Truckstop could reduce the number of accounts, and Ryan could qualify for commissions. *Id.* ¶ 9. Strasser denies reassigning accounts, except upon customer request. *Id.*

Ryan recalls that the purpose of the meeting on December 13, 2018, was not to discuss reassignment of her accounts; rather, she recalls meeting with Strasser, during which he asked Ryan for a list of her accounts,[9] and that he and Bartron asked how she was feeling. Ryan Depo. at 111 – 112. Ryan also disputes the information contained in Strasser's notes allegedly documenting the topics discussed during the meeting, and there is no evidence in the record Ryan was shown or asked to sign a copy of Strasser's notes. Ryan Depo. at 111 – 112. Thereafter, Ryan contends that Strasser began reassigning Ryan's most lucrative accounts despite Ryan continuing to service them, which meant her commissions on sales from those accounts were paid to someone else. Ryan Decl. ¶

---

[8] It is not clear from the record whether Ryan knew about Bartron's reassignments.
[9] Ryan testified during her deposition that she was agreeable to reviewing a list of accounts with Strasser so that none of them would suffer from lack of service. Ryan Depo. at 206. (Dkt. 22-7 at 20.)

11. Ryan states Strasser did not consult with her before reassigning her accounts, and that he did not discuss with her whether she could continue to service them. *Id.* Ryan confronted Strasser, who "flippantly told [her], 'I assumed you were going to be gone 60% of the time on leave, so I'm taking 60% of your accounts.'" *Id.*

Ryan's co-worker, Daniel LaNoue, states he was aware Strasser began taking Ryan's best accounts and giving them to other members of the mid-market sales team, including to him. LaNoue Decl. ¶ 7. According to LaNoue, the reassignment of Ryan's accounts was done without her knowledge, and he was not aware of an organized plan to reassign them. *Id.* He claims to have overheard Strasser "griping about [Ryan] taking FMLA leave," and telling Ryan, "I don't believe you actually have lupus." *Id.*

### December 20, 2018 – Intermittent FMLA Leave Approved

Following an appointment Ryan had with her physician on December 17, 2018, Lincoln financial completed the approval process for Ryan's FMLA leave application on December 20, 2018. Berard Decl., ¶ 12, ¶15, Ex. 9. Ryan was approved for intermittent FMLA leave for up to "5 times every week for 8 hours" for "Incapacity" and "once every week for 2 hours" for "Treatment." *See id*. On December 24, 2018, Ryan received a notice from Lincoln Financial regarding "Intermittent Time Reported." As reflected in that notice, all FMLA time previously reported by Ryan to Lincoln Financial for the period November 12, 2018, up through December 3, 2018, had been "Approved," including previously unapproved time for "Treatment" on November 19, 2018, and November 26, 2018. Berard Decl. ¶ 16, Ex. 10; Ryan Depo., at 171 – 172.

### January 7, 2019

MEMORANDUM DECISION AND ORDER  - 11

On January 7, 2019, at approximately 1:30 p.m., Natalie Stradley (one of Ryan's coworkers) returned from lunch and informed Bartron and Strasser she observed and photographed Ryan sitting in the bar area of a restaurant located near Truckstop's Boise office. Bartron Decl., ¶ 11; Strasser Decl., ¶¶ 11-12. Stradley forwarded the photograph to Bartron, which depicts Ryan seated at the bar with an ex-boyfriend. Bartron Decl., ¶ 11, Ex. 2. Ryan Depo. at 137. The time stamp on the photograph is 1:16 p.m. Bartron Decl. Ex. 2. Bartron contends Ryan was clocked-in as though she was working, and remained clocked in until 3:49 p.m., but that Bartron and Strasser did not see Ryan return to the Truckstop office for the rest of that afternoon. Bartron Decl., ¶ 11; Strasser Decl., ¶¶ 11-12.

At 4:52 p.m., Strasser texted Ryan to inquire about her whereabouts. Ryan responded: "Yes. I left after lunch hour. I just got done and won't be in till tomorrow. I clocked out. Yes. Should be 2 pm." Strasser Decl., ¶¶ 13-14, Ex. E at 9-11. Strasser and Bartron contend that Ryan's request to adjust her clock-out to 2:00 p.m. constituted timecard fraud due to the 44 minute discrepancy between the time stamp on the photo, and Ryan's request to adjust her clock-out to 2:00 p.m. Strasser Decl., ¶ 14; Bartron Decl., ¶¶ 11-12.

### January 8, 2019

On January 8, 2019, Ryan reported to work, and later asked Strasser to clock her in at 11:55 a.m. because Ryan stated she had forgotten to do so.[10]  Strasser Decl., ¶ 15;

---

[10] Strasser states he found a note on his desk later that afternoon from Ryan asking him to adjust her clock-in time. He does not indicate when he saw the note. Strasser Decl. ¶ 15.

Bartron Decl., ¶ 12. Strasser and Bartron claim they did not see Ryan arrive at work until 12:20 p.m., however. Strasser Decl., ¶ 15; Bartron Decl., ¶ 12. Strasser and Bartron reported the two timecard issues to Berard in Human Resources. Strasser Decl., ¶ 15; Bartron Decl., ¶ 12.

Later the same afternoon, Bartron, Berard, and Strasser attempted to speak with Ryan at her desk. However, Ryan was not at her desk and Ryan's co-workers reported that Ryan had left at approximately 2:00 p.m. that day. Bartron Decl., ¶ 12. According to Bartron, Ryan had not informed Berard or Strasser that she was leaving early. Bartron Decl. ¶ 12.

Next, Berard, Strasser, and Bartron compiled a spreadsheet documenting the days after the December 13, 2018 meeting when Ryan did not follow call-in procedures, and the instances of timecard fraud on January 7 and 8, when Ryan allegedly falsified her time by being clocked-in while not at work. Berard Decl., ¶ 22, Ex. 13.

Thereafter, Berard, Bartron, and Strasser met with Conner and discussed how to proceed. Bartron Decl., ¶ 13. Bartron was advised by Berard and Conner that Ryan's "timecard fraud was a terminable offense," as were the other instances after December 13, 2018, when Ryan failed to tell Bartron or Strasser when she was going to be out on leave prior to the start or end of a shift. Bartron Decl. ¶ 13. Bartron agreed with Human Resource's recommendation to terminate Ryan's employment and authorized the same. *Id.*

That evening, Conner prepared a summary of issues that had led to the termination decision and sent it via email to Berard. Conner Decl., ¶ 17. Conner summarized the

events of January 7 and 8, 2019, and set forth how Ryan had violated both the "Time

Clock and Time Keeping" as well as the "Attendance and Punctuality" policies. *Id*., Ex.

8. Conner's email to Berard states that Ryan "has falsified her time, she has not followed

the guidelines and standards set for attendance and timekeeping on numerous occasions.

She has left us [no] choice but to terminate her employment effective immediately." *Id*.

Berard sent Ryan an email at 7:26 p.m. asking Ryan to attend a meeting at 9:00

a.m. the following morning. Berard Decl., ¶ 25, Ex. 14. Ryan did not respond to Berard's

email. Berard Decl., ¶ 25.

### January 9, 2019

On January 9, 2019, at 7:47 a.m., Ryan emailed Strasser to let him know that she

would be out on FMLA that day. *Id*., ¶ 26, Ex. 15. Strasser forwarded the email to

Berard, who in turn emailed Ryan asking again to speak with her that morning. *Id*., ¶ 27,

Ex. 16.

Ryan did not respond to Berard's email, prompting Berard to email Ryan at 10:22

a.m. to inform Ryan that Truckstop was terminating her employment, effective that day,

for falsifying her timecard and not following attendance guidelines and call-in

procedures. Berard Decl., ¶ 28, Ex. 17. *Id*.[11]

### Disputed Evidence Regarding Call-in Policy and Timecard Fraud

---

[11] The termination letter attached to the January 9, 2019 email was dated January 7, 2019. (Dkt. 22-4 at
75.) Berard followed up with an email to Ryan on January 9, 2019, after the letter and initial termination
email had been sent, indicating there was a "typo in the letter that I sent you, it should have been dated
January 9, 2019." (Dkt. 22-4 at 76.)

**MEMORANDUM DECISION AND ORDER - 14**

Ryan contends she gave Strasser as much notice as she could regarding her need for time off due to her medical condition; denies falsifying her timecards; and asserts that she "always followed Truckstop policy to the extent it was enforced." Ryan Decl. ¶ 15, 16, 17.

Ryan presents evidence in support of her assertion that she did not falsify her timecards on January 7 and 8, 2019, because managers entered employee time in the timekeeping system. Ryan provides an email dated May 23, 2017, from Bartron to Ryan and her coworkers informing them that Bartron and another supervisor would be entering all time for employees going forward, such that employees would not enter their own time in the ADP timekeeping system. Ryan Decl. ¶ 14, Ex. A.[12] Truckstop contends the May 23, 2017 email reflects only a trial policy, not a continuing policy.

Jake Walter, Truckstop's Sales Manager for the Expansion Team between May 15, 2017, and December of 2017, supervised Ryan and LaNoue when they were part of the Small Medium Business Team. Walter Decl. ¶ 1. (Dkt. 28-3 at 1.) Walter is currently the Senior Sales Director for Truckstop. *Id.* He states that, during June of 2017, he had difficulty with employees failing to clock in and out, including lunch breaks, each day. *Id.* ¶ 5, Ex. A. Walter references an email he received from Strasser in February of 2018, describing Strasser's solution to employees failing to utilize Truckstop's timekeeping

---

[12] The May 23, 2017 email from Bartron to Ryan and others, including LaNoue, states: "Jake and I will enter your scheduled hours each week. This will alleviate missed punches or access issues. Your part of this trial though is to show up for your scheduled times. Please don't show up late or leave early unless approved by Jake or I. We'll try this for this pay period." (Dkt. 25-2 at 7.)

software, which required Strasser to manually input time entries in ADP when employees missed punches. *Id.* ¶ 7, Ex. B.

Ryan states that Truckstop discontinued using the ADP timekeeping system in December of 2018, and switched to UltiPro. She contends Truckstop had not purchased enough licenses for everyone to be able to log into the system such that, during the transition to UltiPro in December 2018 and January 2019, only supervisors were allowed to enter employee time. Ryan Decl. ¶ 15. She contends, therefore, that she could not have falsified her timecard on either January 7 or January 8, because she was not allowed to enter her own time, which is why she asked Strasser to enter her time on January 8, 2019. *Id.*[13]

Truckstop disputes that Ryan did not have access to UltiPro, providing records allegedly demonstrating Ryan was the user who had clocked out of UltiPro at 3:49 p.m. on January 7, 2019, and that Strasser corrected Ryan's clock-out to 2:00 p.m. as instructed. Second Conner Decl. ¶ 3 – 5. (Dkt. 28-1 at 2.)[14]

Truckstop timekeeping records for employees Daniel LaNoue and Kelly Parrish from UltiPro for the period December 24, 2018 through January 23, 2019, indicate numerous instances where both Parrish and LaNoue reportedly did not clock in or out

---

[13] Ryan does not explain why she instructed Strasser to clock her out on January 7, 2019, at 2:00 p.m. or clock her in at 11:55 a.m. on January 8, 2019.

[14] Truckstop does not explain, however, how Ryan clocked out at 3:49 p.m. when both Bartron and Sasser did not see Ryan return to the Truckstop office for the rest of the afternoon.

MEMORANDUM DECISION AND ORDER  - 16

because they forgot; or had difficulty because UltiPro failed to load. Second Connor

Decl. Exs. A, B.[15]

## DISPOSITION

### 1.  Summary Judgment Standard

Summary judgment is appropriate where a party can show that, as to any claim or

defense, "there is no genuine dispute as to any material fact and the movant is entitled to

judgment as a matter of law." Fed. R. Civ. P. 56(a). One of the principal purposes of

summary judgment "is to isolate and dispose of factually unsupported claims ...." *Celotex*

*Corp. v. Catrett*, 477 U.S. 317, 323 (1986). It is "not a disfavored procedural shortcut,"

but is instead the "principal tool[ ] by which factually insufficient claims or defenses

[can] be isolated and prevented from going to trial with the attendant unwarranted

consumption of public and private resources." *Id*. at 327. "[T]he mere existence of some

alleged factual dispute between the parties will not defeat an otherwise properly

supported motion for summary judgment." *Anderson v. Liberty Lobby, Inc*., 477 U.S.

242, 247–48 (1986). There must be a genuine dispute as to any material fact – a fact "that

may affect the outcome of the case." *Id*. at 248.

---

[15] 12/26/2018 Notes Daniel LaNoue 10:39 a.m. "missed punch this morning at 7 a.m."; 01/16/2019 Notes Daniel LaNoue 10:44 a.m. "forgot to clock in. I got in around 7am this morning. Thank you.'" 01/25/2019 Notes Daniel LaNoue 2:09 p.m. "I had an error logging in. I left for lunch at 12:15." 12/24/2018 Kelly Parrish Notes 6:53 a.m. "was here from 6am to 1030am."; 12/28/2018 Notes Kelly Parrish 6:53 a "was here at 6am, Ulti would not let me login….took lunch from 10:30 – 11:00 and left for the day at 2:30 pm."; 12/31/18 Notes Kelly Parrish 6:44 am "was here at 6am, and left for the day at 1:30 pm."; 01/02/19 Notes Kelly Parrish 7:53 am "was her for the day at 6am, having issues logging in to ulti."; 01/03/19 Notes Kelly Parrish 7:55 am "was here at 6am, took lunch from 11:30 – 12:00 and left at 2:30 pm."

**MEMORANDUM DECISION AND ORDER  - 17**

The evidence must be viewed in the light most favorable to the non-moving party, and the court must not make credibility findings. *See id.* at 255. Direct testimony of the non-movant must be believed, however implausible. *See Leslie v. Grupo ICA*, 198 F.3d 1152, 1159 (9th Cir. 1999). On the other hand, the court is not required to adopt unreasonable inferences from circumstantial evidence. *See McLaughlin v. Liu*, 849 F.2d 1205, 1208 (9th Cir. 1988).

The moving party bears the initial burden of demonstrating the absence of a genuine dispute as to a material fact. *See Devereaux v. Abbey*, 263 F.3d 1070, 1076 (9th Cir. 2001). To carry this burden, the moving party need not introduce any affirmative evidence (such as affidavits or deposition excerpts) but may simply point out the absence of evidence to support the non-moving party's case. *See Fairbank v. Wunderman Cato Johnson*, 212 F.3d 528, 532 (9th Cir. 2000).

This shifts the burden to the non-moving party to produce evidence sufficient to support a jury verdict in his favor. *See Devereaux*, 263 F.3d at 1076. The non-moving party must go beyond the pleadings and show "by her ... affidavits, or by the depositions, answers to interrogatories, or admissions on file" that a genuine dispute of material fact exists. *Celotex*, 477 U.S. at 324 (internal quotation marks omitted). However, the court is "not required to comb through the record to find some reason to deny a motion for summary judgment." *Carmen v. S.F. Unified Sch. Dist.*, 237 F.3d 1026, 1029 (9th Cir. 2001). Instead, the "party opposing summary judgment must direct [the court's] attention to specific, triable facts." *S. Cal. Gas Co. v. City of Santa Ana*, 336 F.3d 885, 889 (9th Cir. 2003).

**MEMORANDUM DECISION AND ORDER  - 18**

2.      **Evidentiary Objections**

In its reply memorandum, Truckstop raised three evidentiary objections to

materials submitted by Ryan in opposition to its summary judgment motion. First,

Truckstop contends that the declaration of Kelly Parrish (Dkt. 25-3) should be excluded,

because Parrish was not disclosed as a person with knowledge in either Ryan's initial

disclosures or during discovery. However, the Court did not rely upon the Parrish

Declaration, and therefore needs not rule on the objection.[16] As indicated in the analysis

section, the record contains other materials and declarations supporting Ryan's factual

allegations related to employee timekeeping in ADP and UltiPro, and Truckstop's

allegedly lax call-in policy.

Next, Truckstop objects to Exhibit A to the Ryan and LaNoue declarations, which

is an email dated May 23, 2017, from Bartron to Ryan and others on the sales team

concerning a trial period for reporting time to managers. Truckstop contends Ryan failed

to produce this email during discovery, and therefore it should be excluded pursuant to

Fed. R. Civ. P. 37(c)(1). Rule 26 requires that a party provide to the other party "a

copy—or a description by category and location—of all documents, electronically stored

information, and tangible things that the disclosing party has in its possession, custody, or

---

[16] Ryan's initial disclosures identified "current and former employees of Defendant, including…." (Dkt. 28-2 at 9.) While several Truckstop employees were identified by name, Parrish was not included in the list. Truckstop employed Parrish between June of 2018 and December of 2019. Parrish Decl. ¶ 1. (Dkt. 25-3 at 1.) To the extent that Parrish may corroborate Ryan's factual account, if Ryan intends to call Parrish as a witness at trial, Truckstop will be allowed to take Parrish's deposition, if requested, and Ryan will be required to pay the court reporter's cost for the original and one copy of the deposition transcript.

control and may use to support its claims or defenses, unless the use would be solely for impeachment." Fed R. Civ. P. 26(a)(1)(A)(ii).

Truckstop's objection is overruled. The email attached to Ryan's and LaNoue's declaration is Truckstop's business record and not maintained by Ryan after her employment was terminated. Ryan indicated at the hearing that she did not have a copy of this email until it was provided to her by LaNoue. Further, Truckstop relies upon the same email in its reply memorandum to dispute Ryan's claim that employees did not enter their own time in ADP. The email is relevant and material in light of Ryan's claim, albeit disputed, that Truckstop managers entered all employees' time while Truckstop utilized the ADP timekeeping software.

The last objection concerns Daniel LaNoue's declaration. Truckstop contends paragraphs 3, 5, 6, and 7 should be stricken. First, Truckstop argues that LaNoue's claim that "Truckstop's call-in policy was rarely enforced" is unsubstantiated because it is inconsistent with how Truckstop counseled Ryan regarding their call-in policy. Next, Truckstop contends the Court should strike LaNoue's statement that "usually, management had to enter our time," because it is irrelevant to Ryan's experience and whether she falsified her time on January 7 and 8, 2019. Finally, Truckstop contends that LaNoue's statements regarding Strasser's feelings about Ryan taking FMLA leave are broad statements without support.

Fed. R. Civ. P. 56(c)(4) requires that "affidavit[s] or declaration[s] used to support or oppose a motion [for summary judgment] must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is

**MEMORANDUM DECISION AND ORDER - 20**

competent to testify on the matters stated." Rule 56 also provides that "[a] party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence." Fed. R. Civ. P. 56(c)(2). Witness testimony is admissible during trial if the witness has personal knowledge of the matter. Fed. R. Evid. 602.

LaNoue was employed at Truckstop between February 2017 and December 2019, during which time he worked with Ryan and reported to the same supervisors as she did, including Strasser. As a Truckstop employee, he was also subject to the same company call-in policy and time keeping systems as Ryan. Because LaNoue worked at Truckstop with Ryan and reported to the same management team as she did during all but one month of Ryan's employment, LaNoue certainly has personal knowledge of Truckstop's policies, and its practice of enforcing them, during the relevant time periods. Further, LaNoue states in his declaration that he overheard Strasser tell Ryan that he did not believe she had lupus, and "griping about [Ryan] taking FMLA leave," which reasonably form the basis for his statements regarding Strasser's feelings about Ryan's leave time. For the purposes of opposing this motion, LaNoue's statements will be considered, and Truckstop's objection is overruled.

### 3.      Standard for a Prima Facia Case Under the FMLA

The FMLA provides "eligible employees" up to twelve weeks of unpaid, protected leave in the event of a serious health condition, to care for a family member who is ill, or to care for a new baby. *Bachelder v. America West Airlines, Inc.*, 259 F.3d 1112, 1119-20 (9th Cir. 2001) (citing 29 U.S.C. §§ 2612(a), 2614(a)). "'[T]he FMLA creates two

interrelated, substantive employee rights: first, the employee has a right to use a certain amount of leave for protected reasons, and second, the employee has a right to return to his or her job or an equivalent job after using protected leave.'" *Sanders v. City of Newport*, 657 F.3d 772, 777 (9th Cir. 2011) (quoting *Bachelder*, 259 F.3d at 1122).

Under 29 U.S.C. § 2615, courts recognize two theories of recovery on FMLA claims: interference and retaliation. *Sanders*, 657 F.3d at 777 (citing *Xin Liu v. Amway Corp.*, 347 F.3d 1125, 1133 & n.7 (9th Cir. 2003); *Smith v. Diffee Ford-Lincoln-Mercury, Inc.*, 298 F.3d 955, 960 (10th Cir. 2002)). Ryan proceeds solely on a claim of interference.

The FMLA provides that "it is 'unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise' the substantive rights guaranteed by FMLA." *Sanders*, 657 F.3d at 777 (quoting 29 U.S.C. § 2615(a)(1)). Interference under § 2615(a)(1) has been interpreted broadly. A claim of interference not only encompasses the denial of FMLA rights, but also includes instances where an employer discourages an employee from using FMLA leave, retaliates against an employee for having exercised or attempted to exercise FMLA rights, or otherwise causes the employee to suffer an adverse employment action as a consequence of taking FMLA leave. *See Bachelder*, 259 F.3d at 1122-23.

In this case, Ryan argues that Truckstop interfered with her right to FMLA when it terminated her employment effective January 9, 2019. "To ultimately prevail on an FMLA interference claim, a plaintiff 'need only prove by a preponderance of the evidence that her taking of FMLA-protected leave constituted a negative factor' in the

**MEMORANDUM DECISION AND ORDER - 22**

employment decision. The plaintiff 'can prove this claim...by using either direct or circumstantial evidence, or both.'" *Andreatta v. Eldorado Resorts Corporation*, 214 F.Supp.3d 943, 953 (D. Nev. 2016) (quoting *Bachelder*, 259 F.3d at 1125). *See also Sanders*, 657 F.3d at 778 ("In this circuit, we have declined to apply the type of burden shifting framework recognized in *McDonnell Douglas* to FMLA interference claims.").

 To establish a prima facie case of interference, the plaintiff must show that: (1) she was eligible for FMLA protection; (2) her employer was covered by FMLA; (3) she was entitled to leave under FMLA; (4) she gave her employer sufficient notice of her intent to take leave; and (5) her employer denied her FMLA benefits to which she was entitled. *Sanders*, 657 F.3d at 778 (citing *Burnett v. LFW, Inc*., 472 F.3d 471, 477 (7th Cir. 2006)).

For purposes of requesting summary judgment, Truckstop claims Plaintiff cannot prove the final element, denial of FMLA benefits to which Ryan was otherwise entitled. Truckstop contends Ryan cannot show that she was entitled to FMLA benefits, because Truckstop had legitimate reasons to terminate her employment and therefore she cannot establish that her intermittent FMLA leave was a factor in the termination decision.

**4.    Analysis**

Ryan first contends she has established a prima facie case for interference, merely because her employment was terminated while she was on FMLA leave. Truckstop argues Ryan inaccurately states the applicable law. An employer may terminate the employment relationship while the employee is on FMLA, so long as the employer establishes it would have done so had the employee not taken leave. *Gambini v. Total*

*Renal Care, Inc.*, 486 F.3d 1087, 1097 (9th Cir. 2007). Accordingly, the mere fact that Truckstop terminated Ryan's employment after Ryan had been approved for intermittent FMLA leave does not, standing alone, defeat Truckstop's motion for summary judgment.

Truckstop maintains it terminated Ryan's employment because she failed to follow attendance guidelines and call in procedures after she was counseled on December 13, 2018, and because she falsified her work time on January 7 and 8, 2019. Ryan counters Truckstop's stated reasons for the termination with evidence that Truckstop did not consistently enforce its stated call-in and attendance policy throughout her employment, and that Truckstop managers entered employee hours for her and others. She also references Strasser's negative comments concerning her reason for requesting FMLA leave as evidence that approval for intermittent FMLA leave was a factor in the decision to terminate her employment.

There are material factual disputes concerning whether FMLA was a factor in the decision to terminate Ryan's employment, and concerning Truckstop's stated reasons for the termination decision. The factual discrepancies, taken together with the timing of the decision in proximity to approval of intermittent FMLA leave, preclude the Court from finding, as a matter of law, that Plaintiff cannot prove her claim. The Court will explain.

There is a material factual dispute whether Ryan's instructions to Strasser to clock her in and out on January 7 and 8, 2019, constitute timecard fraud, as Truckstop asserts. Truckstop claims fraud for a 44 minute discrepancy between the timestamp of 1:16 p.m. on the photograph taken of Ryan at the restaurant on January 7, 2019, and Ryan's instructions to Strasser to clock her out at 2:00 p.m. that same afternoon; and a 25 minute

discrepancy on January 8, 2019, the difference between Ryan's observed arrival time at 12:20 p.m., and Ryan's instruction to Strasser to clock her in at 11:55 a.m. However, there is evidence in the record that Truckstop had longstanding difficulties with enforcing the clock-in and clock-out policy stated in the Truckstop employee handbook relied upon by Conner, Bartron, Strasser, and Berard, leading to a reasonable inference that "timecard fraud" was not a legitimate reason for termination.

There is evidence in the record that employees often forgot to clock in and out, and that the rigid procedures Truckstop expected of Ryan after she applied for and was approved for intermittent FMLA leave had been disregarded for others. For instance, in 2017, Truckstop instituted a stated "trial policy" whereby Bartron and other managers would enter scheduled hours each week to alleviate missed punches or access issues. Jake Walter complained in June of 2017 to his sales team, which included Ryan and LaNoue, that employees were not entering time consistently, sometimes failing to enter time at all via the ADP timekeeping software. In February of 2018, Strasser shared his solution whereby he would send his team members a screenshot of their timecard for the pay period, request verification of punches, and request that employees notify him concerning what should be input for missed punches so as to provide "supporting documentation for our necessary manual entries." (Dkt. 28-3 at 7.)

Ryan's timekeeping records in ADP beginning January 1, 2018, through December 24, 2018, appear to reflect she did not consistently punch in or out during scheduled work hours. For instance, the timekeeping records Truckstop provided reflect Ryan did not always work between her stated hours of 9:00 a.m. and 5:30 p.m., and that

Bartron would, at times, manually enter or edit Ryan's time entries. Ryan and LaNoue both aver that strict attendance was not enforced.

Turning to the timing of Ryan's termination from employment, Truckstop's records from its new timekeeping software, UltiPro, show instances where LaNoue missed his punch at 7:00 a.m. on December 26, 2018; forgot to clock in and reported he arrived "around 7am" on January 25, 2019; and reportedly left for lunch at 12:15 on January 25, 2019, due to a login error. Similarly, Truckstop's timekeeping records for Kelly Parrish during the period between December 24, 2018 and January 3, 2019, reflect she reported ballpark estimates of her arrival and departure times over the course of several days. LaNoue's and Parrish's timekeeping records indicate also that UltiPro would not permit them to log-in at times, which is consistent with Ryan's assertion that Truckstop had not purchased sufficient licenses to allow everyone to be able to log into the new system to enter their own time.

Yet, it is only after Ryan applies for intermittent FMLA leave on November 14, 2018, and thereafter receives approval on December 20, 2018, to take intermittent FMLA leave, that she is allegedly counseled not once, but several times regarding Truckstop's supposed rigid policy to clock-in and clock-out. Given these facts, a reasonable jury could find that Truckstop was not concerned with minor discrepancies between an

employee's reported time and actual time worked, although concerned about Ryan's discrepancies.[17]

Next, there are statements by Strasser to Ryan, allegedly overheard by LaNoue, that Strasser did not believe Ryan suffered from lupus and that he griped about her taking FMLA leave. Ryan contends also that Strasser unilaterally determined that her most lucrative accounts would be reassigned, and that he interfered with the FMLA application process by telling her that her medical information was insufficient.

Truckstop downplays Strasser's comments by insisting that Strasser was not responsible for the termination decision. But Strasser was involved with compiling a spreadsheet on the evening of January 8, 2019, to document the days after the December 13, 2018 meeting when Ryan failed to report leaving early or arriving late, and the two timecard discrepancies purportedly supporting an allegation of timecard fraud. Thereafter, Strasser, Berard, Bartron, and Conner met during the evening of January 8, 2019, to discuss how to proceed. Both the spreadsheet and the group discussion formed the bases for the decision to terminate Ryan's employment. A reasonable jury could infer that Strasser's involvement in the decision to terminate Ryan's employment, and his alleged animosity toward Ryan's approved FMLA leave, establishes that Ryan's request and approval for intermittent FMLA leave was a factor in the termination decision.

---

[17] Truckstop contends that it terminated the employment of Taylor Callsen for falsifying her timecard during the period October 19, 2018, to October 26, 2018, having discovered Callsen was clocking in remotely and arriving at her workstation anywhere from 4 to 22 minutes later. Conner Decl. ¶ 10. (Dkt. 22-3.) However, the inference to be drawn from Truckstop's decision in Callsen's case is for the jury to determine in light of the conflicting evidence discussed above that Truckstop's timecard policy was not uniformly enforced. Further, there is no indication whether Callsen was on FMLA.

The same evidence reasonably supports Ryan's assertion that Truckstop's call-in procedures were not strictly enforced by Strasser, Berard, and other Truckstop managers until Ryan applied, and was ultimately approved, for FMLA leave. According to Truckstop, between December 14, 2018, and January 8, 2019, Ryan left early or arrived late without notifying Strasser or Berard three times, and she provided notice of a late arrival after her shift began on four other occasions. (Dkt. 22-4 at 68.)[18] FMLA regulations require only that an employee "comply with the employer's usual and customary notice requirements for requesting leave, absent unusual circumstances." 29 C.F.R. §825.302(d); §29 C.F.R. 303(c). Ryan contends that she provided as much notice as possible prior to taking intermittent FMLA leave, and that Truckstop did not previously enforce its call-in policy consistently. There are instances in earlier timekeeping records where Ryan left early without evidence that she either notified a manager, or was subject to discipline. For example, on July 31, 2018, Ryan's timecard audit report appears to indicate she arrived late at 10:13 a.m. and punched out early at 5:18 p.m. (Dkt. 22-3 at 56.)[19]

There is also evidence in the record that, after the switch to UltiPro in December of 2018, Parrish and LaNoue asked managers to enter their time when they forgot to clock in or out, and had difficulty logging in to UltiPro, without being subject to disciplinary action for any timekeeping discrepancies. A jury could reasonably infer that

---

[18] The documented dates are December 17, 19, 21, 26, 27, 2018; and January 3 and 7, 2019.
[19] The Court supplies a caveat, however, that Truckstop did not provide a detailed explanation of its timekeeping records other than to describe them as "true and correct copies of Ryan's timekeeping records from ADP for the period January 1, 2018 to December 24, 2018." Conner Decl. ¶ 3. The record also lacks any pay records or absence notices for the period prior to December 13, 2018.

MEMORANDUM DECISION AND ORDER - 28

it was not until Ryan applied for FMLA leave on November 14, 2018, and was ultimately approved for the same on December 20, 2018, that Truckstop strictly enforced its call-in policy with respect to Ryan, and expected her to do so after the alleged counseling session on December 13, 2018.[20]

In light of the material factual disputes presented by the evidence before the Court on Truckstop's motion for summary judgment, the Court cannot determine as a matter of law that Ryan's taking of FMLA-protected leave was not a negative factor in the decision to terminate Ryan's employment.

## CONCLUSION

Based upon the discussion above, the Court concludes there are disputed issues of material fact concerning whether Truckstop interfered with Ryan's rights under the FMLA by terminating her employment. Summary judgment on Count I will therefore be denied. Summary judgment will be granted to Truckstop on Count II in light of Ryan's concession at the hearing.

---

[20] Ryan disputes that she received coaching on December 13, 2018, concerning attendance expectations. She claims the meeting on December 13, 2018, was to obtain information about her accounts, and she was asked how she was feeling.

**MEMORANDUM DECISION AND ORDER  - 29**

## **ORDER**

**NOW THEREFORE IT IS HEREBY ORDERED:**

Defendant's Motion for Summary Judgment (Dkt. 22) is **GRANTED IN PART AND DENIED IN PART**, as follows:

1)      Summary Judgment is **DENIED** on Count I.

2)      Summary Judgment is **GRANTED** on Count II, without prejudice.

3)      The Court will conduct a telephonic scheduling conference to set this matter for a jury trial. A separate notice of hearing is forthcoming.

DATED: October 18, 2021

Honorable Candy W. Dale
Chief United States Magistrate Judge

**MEMORANDUM DECISION AND ORDER - 30**